In the
Thursday, 30 September, 2004  01:54:50 PM

E-FILED

# United States Court of Appeals

Clerk, U.S. District Court, ILCD

## For the Seventh Circuit

---

No. 03-3840

ROCHESTER HOLMES,

*Plaintiff-Appellant,*

*v.*

JOHN E. POTTER, Postmaster General,

*Defendant-Appellee.*

---

Appeal from the United States District Court for
the Northern District of Indiana, Hammond Division.
No. 99 C 219—James T. Moody, *Judge.*

---

ARGUED JUNE 9, 2004—DECIDED SEPTEMBER 14, 2004

---

Before FLAUM, *Chief Judge*, and BAUER and EVANS,
*Circuit Judges.*

BAUER, *Circuit Judge.*   Plaintiff-Appellant Rochester
Holmes filed an action in the district court claiming dis-
crimination, retaliation and breach of a settlement agree-
ment. The district court disposed of the discrimination and
retaliation claims though the entry of summary judgment
against Holmes. A bench trial on the breach of a settle-
ment agreement ended in favor of the Defendant. Holmes
appeals.

2                                                        No. 03-3840

## I. Background

Plaintiff-Appellant Rochester Holmes began working for the United States Postal Service ("U.S.P.S.") in 1974. In 1984, Holmes was transferred to Saint Paul, Minnesota to serve as Superintendent, Building Maintenance, EAS-17.[1] About two years after his transfer, Holmes' job was affected by a reorganization. He was then promoted to serve as a Maintenance Programs Specialist, EAS-19. In 1989, Holmes' job was again affected by a consolidation of the Twin Cities postal services. Shortly thereafter, Holmes was "detailed"[2] to an EAS-17 position as General Supervisor, Vehicle Operations as a "result of non-competitive placement consideration authorized in [management instructions]." A few days after the detail assignment, Holmes received a letter that said, "[on] October 21, 1989 [Holmes would] be placed non-competitively in the vacant EAS-17, General Supervisor, Vehicle Operations assignment" with a saved grade of EAS-19. Holmes did not apply for, or express interest in the position of General Supervisor, Vehicle Operations.

While serving in the EAS-17, General Supervisor, Vehicle Operations position, Holmes applied for a vacant position as Manager, Vehicle Services, EAS-21. When he learned that he had not been selected for the position, Holmes filed an Equal Employment Opportunity Commission ("EEOC") charge claiming discrimination.

Beginning sometime in 1991, Holmes took sick leave. While on sick leave, he received a letter informing him

[1] A U.S.P.S. employee's salary and duties are governed by a schedule of numbered grade levels. For salaried management employees, the schedule is called the "Executive and Administration Schedule." In U.S.P.S. parlance, EAS-16 means that the position is at grade 16 of the Executive and Administration Schedule with salary and duties that correspond to that grade.

[2] When an employee is "detailed" they have been temporarily assigned to a position.

No. 03-3840                                                    3

that he had been noncompetitively selected for an EAS-19 Maintenance Programs Specialist. As Holmes retained a saved grade of EAS-19, he was given noncompetitive consideration "in compliance with the Twin Cities Division Instruction regarding the Intervening Grade Policy." Holmes had not applied for, or expressed interest in this position.

Afer using up all of his sick leave, Holmes went on leave without pay until he was terminated from the U.S.P.S. in 1992. This termination was challenged in a civil suit. That suit ultimately resulted in a settlement agreement which stated, "Plaintiff's claims arose out of allegations of discrimination under Title VII of the Civil Rights Act of 1964." The settlement agreement also provided that Holmes was to be placed as an EAS-17 Supervisor, Maintenance Operations in Gary, Indiana. Despite his placement in an EAS-17 position, he was given a saved grade of 20.

After placement in Gary, Holmes expected to be solicited for positions at or below his saved grade without expressing interest or applying for those positions. However, despite vacancies in various positions at or below his saved grade, Holmes was never approached about reassignment.

A vacancy in an EAS-21 Manager, Vehicle Maintenance position was posted on April 30, 1996 and again on July 9, 1996. Holmes responded to the second posting and applied for the job on July 22, 1996. A three-member Review Committee was selected and they reviewed the applications. The Committee members discussed applications in a phone call but did not interview the applicants. The Committee ultimately selected three of the applicants as finalists for the selecting official, Veronica Thompson, Manager, Operations Support, to consider. Holmes was not selected as one of the finalists and obviously was not selected to fill the vacancy.

As an aside worth noting at this point, Thompson testified at trial about her experiences in Greenbelt, Maryland

prior to transferring to Illinois. She testified that she was serving in an EAS-21 position with a saved grade of 23 when she was asked if she wanted a detail as Postmaster. She was subsequently asked if she wanted to retain that position on a permanent basis. She was assigned to these positions noncompetitively before they were posted.

Holmes brought this suit in 1999 claiming race and age discrimination, retaliation for complaining of discrimination and breach of the 1994 settlement agreement. The discrimination and retaliation claims were disposed of when the district court granted the Defendant's motion for summary judgment. The U.S.P.S. filed a motion to strike Holmes' jury demand for the trial on the remaining claim for breach of the settlement agreement. The district court granted Defendant's motion and after the trial, entered judgment in favor of the U.S.P.S. Holmes appeals.

## II. Discussion

### A. Breach of 1994 Settlement Agreement

Holmes claims that the trial court erred in its interpretation of the term "saved grade" as used in the October 1994 settlement agreement. Holmes contends that "saved grade" means that he was entitled to be selected for a position noncompetitively and without applying for, or expressing interest in, the position. We review the trial court's findings of fact for clear error and conclusions of law de novo.

In arriving at its conclusions as to the meaning of "noncompetitive selection," and therefore, the meaning of "saved grade," the trial court examined what it called the plaintiff's "three avenues of proof." These avenues consisted of Veronica Thompson's testimony, U.S.P.S. policies during the 1980s and early 1990s in and around The Twin Cities, and two U.S.P.S. personnel documents. In this appeal,

Holmes attacks the reasoning and findings of the trial court as it relates to these three "avenues of proof." We address each in turn.

Beginning with Thompson's testimony, the trial court found that her experiences in being solicited for vacant positions, without expressing interest in such positions, were due to factors other than her saved grade status. The court noted that these solicitations happened after reorganizations of the U.S.P.S. had abolished her job or when she was already performing the job on a temporary basis. These findings are not clearly erroneous and are well-supported by the evidence.

Holmes quotes various passages from Thompson's testimony to refute the findings of the district court. However, the testimony *does* show that Thompson was solicited for jobs for reasons other than her saved grade status, e.g., reorganizations and being asked to permanently fill a job to which she was already detailed. Nevertheless, there is one portion of Thompson's testimony which warrants individual attention.

When Thompson was asked if she had always applied for her positions, she responded, "I've always applied by my performance or meeting with the manager to express a move. I've always had to do that." Holmes says that "by my performance" should be interpreted to mean "that her prior performance helped bring her to the attention of officials who then contacted her." We agree that this is a reasonable reading of her testimony but are unsure how this helps Holmes. It is likely that this phrase "by my performance" relates to her being retained permanently for a position to which she had already been detailed. Furthermore, there is no dispute that Thompson had been solicited for positions and that she did not initiate such solicitations. The dispute is *why* she was solicited and this testimony does not contradict the findings of the district court.

The next "avenue of proof" offered by the plaintiff, and ruled on by the district court, concerns the experiences of Holmes himself during his time in the Twin Cities and various documents outlining U.S.P.S. policies for that geographical location and period of time. In this situation, like Thompson's, Holmes' position was affected by a reorganization. Shortly after the reorganization, Holmes' was solicited for a position without expressing interest and was placed in that position without applying for it. He claims that this experience informed his understanding of the term "saved grade" as used in the settlement agreement. The problem with Holmes' argument is that it relies upon an unreasonable reading of the documents outlining U.S.P.S. policy.

The submitted documents pertain to the "Placement Policies as a Result of the System-wide MSC [management sectional center] Consolidations Effective September 23, 1989." In other words, as the district court noted, the documents relate to a specific context, they have no relevance outside of the reorganization and they should not be used to inform the interpretation of the parties' settlement agreement. Holmes claims, "[t]his determination might be relevant if Holmes was suing to enforce U.S.P.S. policies, but he is not. The significance of U.S.P.S. policies is that they inform the meaning of a term or art, saved grade, used in the 1994 [settlement] Agreement." While this may be true, it does not change the fact that the policies evidenced by the documents clearly relate to "*special* policies and procedures that govern the placement of career nonbargaining unit employees *as a result of* the system-wide management sectional center consolidations effective September 23, 1989." (emphasis added). Therefore, even if Holmes' experiences led him to believe that he did not have to apply for positions because of his saved grade status, the documents show that his belief was mistaken. The use of ordinary care in reading through the policies implemented during the Minnesota

No. 03-3840                                                            7

reorganization would have disabused Holmes of the notion
that these policies had any relevance outside of the reorg-
anization context. Finally, he offers no credible evidence
that the U.S.P.S. shared his erroneous understanding of
the term saved grade. The evidence offered by Holmes falls
far short of proving that the term saved grade means that
he was entitled to noncompetitive placement without
application outside of the reorganization context.

The third and final "avenue of proof" discussed by the
district court related to two U.S.P.S. personnel documents.
The court disregarded the first as Holmes offered no proof
that it was in effect at the time the settlement was exe-
cuted. So, we look to the second personnel document to il-
luminate the parties' understanding of the term saved
grade.

This second personnel document is a provision of the
Executive and Administrative Schedule Selection Policy,
dated December 7, 1993. It reads as follows:

> Management should consider noncompetitive applica-
> tions for voluntary reassignment or change to lower
> level before the competitive announcement process be-
> gins, during the process, or after the competitive appli-
> cations have been assessed. Individuals with saved
> grade must be considered noncompetitively for posi-
> tions up to the grade of their former positions or at any
> intervening grade.

Holmes reads the provision as providing for two distinct
categories of employees eligible for noncompetitive place-
ment: "1) any EAS employee who applies for 'voluntary
reassignment or change to lower level,' at any time before
or during the competitive process or after the competitive
applications have been assessed; and 2) individuals with
saved grade who, unlike the first category, 'must be con-
sidered noncompetitively,' without application, for certain
positions." The district court disagreed with that reading.

Instead, the district court found that the first sentence is broadly inclusive and that the second sentence, a sub-part of the first, merely reminds hiring officials that employees with saved grade must receive noncompetitive consideration when moving to a position at or below their saved grade. This is so, explained the judge, because an employee with saved grade who moves to any position at or below their saved grade makes a lateral reassignment since reassignment would not affect the employee's saved grade. The district court's reading is well-supported by testimonial evidence; Holmes' reading is not similarly supported.

Holmes argues that the testimony supporting the district court's reading of the policy provision is "not credible because it is self-serving without supporting examples, it is inconsistent with the personal experience of Mr. Holmes while in the Twin Cities and the experience of Ms. Thompson while in Maryland, and it is not supported by the language used in U.S.P.S. policies." First, we will not reexamine credibility determinations of the district court. *United States v. Dillon,* 150 F.3d 754, 758 (7th Cir. 1998). Second, Holmes' and Thompson's experiences in the Twin Cities and Maryland were the result of factors other than their saved grade, as already noted above. Finally, it is clear that it is *Holmes'* understanding of the term saved grade that is not supported by the language used in U.S.P.S. policies and not the other way around. The district court did not err.

## B. Discrimination Claim

Holmes' next argument is that the district court erred when it granted Defendant's motion for summary judgment on Holmes' claims of discrimination and retaliation. Because Holmes had no direct evidence of discrimination, he advanced his discrimination claims under the indirect or burden-shifting method. However, the parties do not contend that Holmes failed to make a prima facie showing

of discrimination or retaliation; they focus their arguments on pretext which may be proved by showing that the Defendant's explanation has no basis in fact, that the explanation is not the real reason for the adverse action, or that the stated reason is insufficient to warrant the adverse action. *Hughes v. Brown*, 20 F.3d 745, 747 (7th Cir. 1994). We review a district court's summary judgment determination de novo and construe the facts in the light most favorable to the non-movant. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885 (7th Cir. 2001).

The Defendant stated that the three candidates were selected as finalists by the Review Committee because those individuals were better qualified than the other applicants. The litmus test used by the Review Committee was current knowledge and recent experience in the position being offered or related jobs. Holmes attempts to show that this "litmus test" is a pretext for discrimination by pointing to four different sets of facts.

Holmes claims that pretext is shown because current experience in vehicle maintenance was not posted as a requirement for filling the position in question. However, as the district court noted, the posting would state the *minimum* qualifications so as to create a larger pool of minimally qualified applicants. The fact that the Review Committee ultimately relied upon factors not mentioned by the vacancy posting does not show discrimination. Nor does the fact that the vacancy announcement was posted twice show discrimination.

Holmes suggests that the reason the vacancy was posted twice is because "the selecting official was not impressed with the applicants responding to the first posting, including [the two finalists who were ultimately chosen from the first posting]." There is no evidence that this was the case. Deposition testimony revealed that a position may be posted a second time because there were too few responses the

first time. Furthermore, if the second posting did not result in a group of applicants more qualified than the first posting, it would not be unusual to hire from the first posting. So, we do not know why the job was posted twice.

Next, Holmes points to a black applicant who was serving as Supervisor, Vehicle Supplies and had served six details as Manager Vehicle Maintenance as a qualified applicant who was not selected. This proves nothing; it is undisputed that Holmes did not have current experience in managing vehicle maintenance or an auxiliary vehicle maintenance facility. Furthermore, he had significantly less experience than the three finalists.

Holmes asked two Postal Service officials with whom he is acquainted to compare his qualifications to those of the three finalists selected by the Committee. Those officials believed that Holmes was highly qualified for the position. However, "[w]e do not sit as a superpersonnel department that reexamines an entity's business decision and reviews the propriety of that decision. Our only concern is whether the legitimate reason provided by the employer is in fact that true one." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000) (citation removed). The evidence fails to show pretext because, as the district court said, "it does not establish that Holmes was so clearly superior to the finalists chosen that no reasonable person exercising impartial judgment could have made the same decision that the review committee did." Citing *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1180-81 (7th Cir. 2002).

Holmes' next argument centers around the fact that there were eight black applicants, one Hispanic applicant, and four white applicants. The three ultimately selected as finalists were white. The remaining white applicant had prior EEOC activity. Holmes offers this statistical evidence as relevant—but not dispositive—in light of other evidence showing pretext, for statistical evidence alone is insuffi-

cient to show disparate treatment. *See Kidd v. Illinois State Police*, 167 F.3d 1084, 1101 n. 16 (7th Cir. 1999); *Kadas v. M.C.I. Systemhouse Corp.*, 255 F.3d 359, 363 (7th Cir. 2001). But without other evidence of pretext, this evidence is irrelevant.

Finally, it is worth noting that two of the Review Committee members expressly stated that they did not know Holmes' race and were not aware of any prior EEOC activity. The third Committee member, a black male over the age of forty, stated, "I deny I discriminated against [Holmes] based on his race, age, or any other non-meritorious reason. I did not and still do not know Mr. Holmes." He also stated that he was unaware of any prior EEOC activity as it related to Holmes. Usually, an employer's lack of knowledge about a protected category rings a death knell for discrimination claims. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) ("[T]here is no indication that [the employer] even knew about the [protected activity] when [an adverse action took place]"). However, under our standard of review, we do not assume that the third Review Committee member was unaware of Holmes' protected status. Nevertheless, the facts presented clearly support the granting of summary judgment.

## C. *Right to Trial by Jury*

Holmes claims that the district court erred in striking his jury demand on the breach of contract claim. This argument is meritless. The Seventh Amendment's right to a jury trial does not apply to suits against the federal government. *Lehman v. Nakshian*, 453 U.S. 156, 160 (1981). And when the government has waived its sovereign immunity, "a plaintiff has a right to a jury trial only where that right is one of the terms of the [government's] consent to be sued." *Bowden v. United States*, 176 F.3d 552, 555 (D.C. Cir. 1999); *Lehman*, 453 U.S. at 160. 42 U.S.C. § 1981a states,

"[i]n an action . . . against a respondent who engaged in
unlawful intentional discrimination . . . the complaining
party . . . may demand a trial by jury." The district court,
relying on *Bowden*, held that Holmes' claim of breach of
contract did not require proof of "intentional discrimina-
tion" and therefore, he was not entitled to a trial by jury.
Holmes requests that we not follow our sister circuit's rea-
soning in *Bowden*. We decline to accept his invitation and
instead, adopt the reasoning of *Bowden* on this issue.

## III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of
the district court.

A true Copy:

     Teste:

                     _____
                     *Clerk of the United States Court of
                     Appeals for the Seventh Circuit*